# Louisville & Nashville Railroad Company v. Berry.

(Decided June 3, 1924.)

## Appeal from Estill Circuit Court.

1. Master and Servant—Absence of Light at Switch Held Not Cause of Injury.—A trainmen injured while operating levers at intersection of two railroads, when wheel struck rising derail with consequent reaction on lever, cannot complain that railroad was negligent in not having a light near derail, where night was foggy, and he could not have seen it.

2. Master and Servant—Railroad Held Not Negligent in Not Equipping Interlocking System with a Detector Bar.—Railroad held not

shown to be negligent in not equipping interlocking system at railroad intersections with a detector bar; there being no showing that they were in general use, or that plaintiff would not have been injured in any event while operating derail lever.

WOODWARD & WARFIELD, HUNT, NORTHCUTT & BUSH, and ROBERT R. FRIEND for appellant.

J. M. McDANIEL, J. A. HOBSON and FRED P. CALDWELL for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

The Cincinnati and Corbin Division of the L. & N. R. R. Co., known in this record as the "main line," runs in a southerly direction between the points named. The Lexington-Maloney Division of the same company, called the "L. & E.," runs east and west, the tracks of the two divisions intersecting at the city of Winchester.

Trains on the main line have the right of way and are protected at this point from approaching trains on the other division by derails upon the tracks of the latter. There is one of these on each side of the crossing and about 225 feet therefrom, so that normally the main line is open and the L. & E. is blocked.

A derail is a small block of iron nearly fifteen inches in length and nine inches in width. It is placed inside of the track, but when in position rests upon the rail. There is a groove in it, in which the flange of the car wheel fits, and which will cause the wheel to run to the outside of the rail, and thereby throw the car off the track. The derails are part of an interlocking plant which is operated and controlled by means of levers placed in a small building called the "cabin," which is located just to the east of the main line and south of the L. & E. track. It is 10 feet 3 inches by 6 feet 4 inches, with glass windows on three sides, and is used only by train crews of the L. & E. Division, and is kept closed and locked at all times except when the operator is entering or leaving. The derails are connected with levers in the cabin by means of iron rods, the attachment affording a rigid action, so that the movement of either reacts upon the other.

There are four levers. Lever No. 4 controls the signals on the main line and locks or unlocks the door of the cabin. Lever No. 2 controls the derails on the L. & E. and levers numbers 3 and 1 control the signals on the L.

& E., notifying the trainmen when the line is open or closed.

Upon entering, the first lever thrown is number 4, which automatically closes and locks the door and gives a signal to the main line trains. Conversely, this is the last lever to be worked before leaving, thus restoring the signals of the main line to normal, and unlocking the door for the operator's exit. The derails are controlled by number 2, which is second in manipulation. Numbers one and three control the signals on the L. & E. the selection of which depends on the direction the train is moving; the arrangement being such that the levers can be thrown only in the order named; that is, 4-2-3-1 or 4-2-1-3, and in restoring them to their normal position after the train passes this order is reversed and can only be 1-3-2-4 or 3-1-2-4, in either of which events the main line is again opened and the L. & E. blocked.

The rules of the company for the operation of the levers were set out on a large chart posted in a conspicuous place in the cabin. One of these being, "Do not change levers when train is between derails."

James Berry, a trainman of many years' experience, had been a conductor on a freight train for five or six years and had acted in that capacity on the L. & E. for more than a year prior to the injuries of which he complains.

About 12:30 a. m. on the 3rd day of December, 1920, he was in charge of an east-bound freight train on the L. & E. Division, which had orders to pick up some empty cars at Winchester. The empty cars were on the east side of the crossing, but the train stopped on the west side. There were two engines, and these were uncoupled and proceeded across the tracks to the eastern side, where they did some switching, and procured the cars and returned with them to the train and coupled thereto preparatory to proceeding eastward.

Berry went into the cabin before the first crossing and aligned the levers, giving the engines a clear passage, and after they had passed eastwardly properly reversed the levers. Upon their return with the empty cars he again provided for their passage back over the crossing and started to restore the track to its normal position.

In doing this he unlocked the door of the cabin, worked lever No. 4 and pushed lever No. 2 controlling the derail, while the cars were still in the block. As a result the wheel of a car struck the rising derail before it was placed

in position and forced it down, with a consequent reaction on the lever which he was using, and which rebounded and struck him in the chest, fracturing three ribs and crushing the chest walls. He was knocked down and seriously injured, but recovered sufficiently to work the lever properly after the train had passed out of the block.

In a suit for personal injuries Berry recovered a judgment for $15,000.00 and this appeal results. It is insisted that the court should have given a peremptory instruction for the defendant, and a consideration of this requires a reference to the evidence.

It is claimed for the appellee that the premises were unsafe and the appliances defective. As to this Berry states that the derail was so small that he could not see it from the cabin; that there should have been a target signal at or near it, by which its position could have been determined with reference to passing trains; that the night was dark and foggy and he was locked in the cabin without any means of determining when the train had passed out of the block and could only judge of that by the passage of time and the sound of the moving cars; that he could not see any light in that direction, and waited from thirty to thirty-five seconds after the train had passed the cabin and then worked the lever ten or fifteen seconds too early.

A target signal is a small multicolored bull's eye. It is placed near the track and changes color with the mechanical operation of the block, and indicates to trainmen whether the line is open or closed. It does not diffuse light, and while Berry complains of its absence, he admits that he could not have seen such light if it had been there at the time.

However, it appears that the use of such signals was obviated by semaphore signals placed a few feet west of the derails and which gave a much stronger light. When the train passed this light it was past the block, and if visible, Berry should have been able to determine that fact. Certainly he could if the night was clear and the light burning, and he does not claim that it was not burning, but he says it was so foggy that he did not even see this light, and further, was asked the question: "So then the fact that there wasn't any light there at the switch had nothing to do with it?" A. "No, not in this fog." It not being shown that the target light was effective or necessary, or regarded as necessary or used elsewhere, and as plaintiff admitted that the absence of a

light at the switch had nothing to do with the accident, we can perceive of no negligence on the part of the company in this respect.

He further states that the interlocking system was defective in not being equipped with a device known as a "detector bar," which is a thin bar of iron about one-fourth inch thick and twenty-five feet long, working in a slot on the inside of the rail opposite the derail, and which is connected with the derail by the same rods which control the latter, and which is raised or lowered simultaneously therewith, the bar being long enough to reach between the car wheels, by which it is pressed down continuously during the passage of the train, and that thereby the derail is held down and an accident such as this one obviated. His evidence is to some extent corroborated by other trainmen, he and they merely intimating that it is a device in common use. However, he admits that he had never seen such bar in use, and does not know of any on the L. & N. Division; that he was familiar with the grounds and system in use at this place; had operated the levers as many as fifteen times, and frequently had observed the derail and knew that there was no detector bar.

It is not shown by any one that such bar is generally or commonly used or that it is a necessary device for the protection of operators or that it is so regarded. All the witnesses admit that the bar is primarily intended to prevent the derailing of cars by the careless use of the levers, and there is evidence to the effect that if the lever is prematurely drawn, the action of the car wheels upon the detector bar is entirely similar to that of striking the derail, either of which would cause the lever to rebound. However that may be, plaintiff's witnesses were unable to show but one place on the entire L. & N. system at which this device is in use, nor did they point out any other system on which it is used, or show that it is a practical appliance for the protection of the operators, or so regarded generally.

Berry was familiar with the tracks and all of the various instrumentalities and devices of the system in use at this place; he was aware of the atmospheric conditions before he entered the cabin; he understood the rule forbidding the use of the levers while the train was between the derails. He claims that he had not been instructed and did not know that a violation of this rule was fraught with danger to himself, but admits that he knew such action

might derail the cars or engines and thus be attended with most serious consequences. He was in charge of the train and its crew and responsible for their safety, and if the night was so foggy that the usual and ordinary lights were insufficient to enable him to discharge his duties, he knew of this before entering the cabin, and might have adopted signals to be given by the train crew to notify him when the engines had passed the block, or in the absence of such direction he could have waited a sufficient length of time to be sure of his actions before using the levers. He neglected to take this precaution and thereby brought the injury upon himself. He is badly injured and has suffered greviously, but it does not seem that the company failed in any duty it owed him, and that his injuries are not the proximate result of any negligence upon its part. It follows that a peremptory instruction should have been given for defendant.

In view of the conclusion reached it is unnecessary to consider the other questions raised.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.